OPINION
{¶ 1} This is an appeal by defendant-appellant, Robert A. Wilson, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of gross sexual imposition.
 {¶ 2} On June 26, 2002, appellant was indicted on two counts of gross sexual imposition, in violation of R.C. 2907.05. The matter came for trial before a jury beginning on May 3, 2004.
 {¶ 3} Jessica Wilson ("Jessica"), age 15, is the daughter of appellant. Jessica and her twin brother, Justin Wilson ("Justin"), live with their mother, Rebecca Pack. Pack and appellant were married in 1987 and divorced two years later. At the time of the divorce, Pack was named the custodial parent of the children and appellant received visitation rights. After the twins reached the age of two, appellant did not see them again for approximately six years. However, when the twins were eight years of age, they began visiting their father again every other weekend.
 {¶ 4} The events giving rise to the indictment took place during a weekend visitation in December 2001. At the time, appellant resided with his father, Daniel Wilson, at Wilson's residence at 2681 Bonnie Circle, Columbus.
 {¶ 5} On Friday evening, December 7, 2001, appellant went out for the evening, while Jessica and her brother remained at the house with their grandfather. During their weekend visits, Jessica and her brother would sleep in the living room on separate couches, and Jessica went to sleep on the couch that night at approximately 9:00 p.m. Later that evening, Jessica woke up when she heard her father coming into the garage.
 {¶ 6} Appellant opened the door and came inside the house. Jessica was wearing a large t-shirt, and she testified that appellant came over to the couch and began touching her chest over her clothing. Jessica "moved kind of to the side a little bit," not wanting him to know she was awake "because it was really scary." (Tr. 46.) As Jessica pretended to be asleep, appellant continued feeling her breasts, "kind of rough." (Tr. 46.) Jessica testified that appellant then went "underneath my bra and my clothes, and he started rubbing my chest underneath my clothes." (Tr. 47.) Jessica then opened her eyes and rolled over again. At this point, her father went upstairs.
 {¶ 7} During the incident, Jessica smelled alcohol on her father, and she stated that he was acting drunk; "[h]is steps were heavy, and he kind of swayed and kind of stumbled a little bit." (Tr. 48.) Jessica did not try to do anything at the time because "I was 13 years old and I was scared. I didn't know what was going on. This had never happened before * * * and my dad is * * * really tall and he's just so big and I was just so scared." (Tr. 49.)
 {¶ 8} Jessica eventually fell back asleep, and when she awoke the next morning her brother was playing a video game. Jessica told her brother what had happened and she then called her grandmother, Debra Romans. Jessica testified that she "wanted to get out of the house as soon as I possibly could. I was afraid if he heard us up and about that he would come down." (Tr. 51.) Jessica and her brother walked to their grandmother's house approximately two blocks away.
 {¶ 9} Jessica's brother Justin testified that, on the date of the alleged incident, after his father left the house for the evening, he fell asleep on the couch in the living room and did not hear his father return. Early the next morning, Justin awoke and began playing video games. He noticed that Jessica was awake, and she spoke with him about the incident. Initially, Justin did not believe that his father "would do anything like that." (Tr. 76.) However, when he observed that his sister was scared and worried, he believed her, and they then walked to their grandmother's house.
 {¶ 10} Debra Romans is the mother of Rebecca Pack, and resides at 2570 Millview Drive, Columbus. Early on the morning of December 8, 2001, she received a phone call from Jessica. Following the phone call, Romans told one of her daughters, Lori Poff, to drive over to appellant's house and pick up Jessica and Justin; the children, however, had already walked over to Romans' house before Poff arrived at appellant's residence.
 {¶ 11} Romans then called her daughter Pack, who arrived at Romans' house about 20 minutes later. Romans described Jessica as "[n]ervous, shaky, truly upset" that morning. (Tr. 96.) Romans contacted the police, and two officers arrived shortly thereafter and spoke with Jessica.
 {¶ 12} On the morning of December 8, 2001, after receiving a phone call from her mother, Pack drove to her mother's house and spoke with Jessica; Pack also spoke with police officers that morning. Pack testified that, later that day, at approximately 3:00 p.m., appellant phoned and told her he could not find the children. Pack told appellant, "`Yeah. Jessie called me this morning, she wasn't feeling good, and I came and got them.' That's all I said to him." (Tr. 112.) Pack did not say anything further to appellant based upon her earlier discussions with the police officers.
 {¶ 13} Pack subsequently went to court seeking to change the custodial arrangement, and appellant did not appear for a scheduled hearing. After December 8, 2001, the children did not visit with appellant, and he did not call to arrange visitations or to pick them up as he had previously done. Pack also did not receive any phone calls from appellant regarding the children.
 {¶ 14} Columbus Police Detective Brian Sheline is assigned to the department's juvenile bureau, and, as part of his duties, he investigates cases involving allegations of sexual abuse. Detective Sheline investigated the allegations regarding appellant. The detective was provided information from Franklin County Children Services, and he subsequently interviewed Jessica, Justin, and Pack.
 {¶ 15} Detective Sheline also contacted appellant and asked him to come to police headquarters voluntarily to discuss the allegations; appellant came to police headquarters in March of 2002, and the detective interviewed him. Regarding the events of Friday evening, December 7, 2001, appellant told the detective that Jessica and Justin had gone to bed, and that he went out "partying" at a bar on Brice Road. (Tr. 146.) He returned later that evening, but was unsure as to what time he arrived home, remembering only bits and pieces of the events that night. Appellant denied touching Jessica in an inappropriate manner, telling the detective he would not do that to her. Appellant informed the detective that he last saw Jessica and Justin several weeks before Christmas and that, following the alleged incident, he made no attempt to contact the children. Appellant indicated that he was not really interested in seeing the children at the time.
 {¶ 16} A warrant was subsequently obtained for appellant's arrest. According to Detective Sheline, as officers were knocking on the door of his residence, appellant "unexpectedly pulled up in the driveway, observed us, observed two marked police cars right down the street, backed out of the driveway and sped off." (Tr. 155.) The officers attempted to pursue him through a neighborhood, but, because they were approaching 60 miles per hour, they deemed it unsafe to continue the pursuit. Appellant subsequently turned himself in to the authorities, and was indicted by a grand jury.
 {¶ 17} Daniel Wilson, the father of appellant, testified on behalf of his son. On December 8, 2001, when Jessica and Justin came over to Wilson's house to spend the weekend, Wilson recalled that Jessica was upset about her father not allowing her to attend a slumber party. At approximately 9:00 p.m., appellant left the house for the evening. Wilson did not remember hearing his son arrive back home. When Wilson awoke at 8:00 a.m. the next morning, Jessica and Justin were gone, and Wilson woke up appellant to inform him they had left.
 {¶ 18} Appellant, who works as a journeyman carpenter, testified on his own behalf. Appellant related that, when he picked up Jessica and Justin on Friday evening, December 7, 2001, Jessica asked if she could attend a slumber party the next evening. Appellant refused to give Jessica permission to go. Later that night, appellant went to a bar in Reynoldsburg. He denied that he was drunk when he came home, and further denied touching Jessica on the breasts. Appellant testified that, following the alleged incident, he telephoned the children's mother once to ask about setting up a Christmas visitation.
 {¶ 19} On cross-examination, appellant acknowledged that he told Detective Sheline that he did not have any contact with them after the weekend visitation at issue. Appellant denied that he tried to flee from police officers in his car.
 {¶ 20} Following deliberations, the jury returned verdicts finding appellant guilty of both counts of gross sexual imposition. By entry filed June 23, 2004, the trial court sentenced appellant to 12 months incarceration on each count, with the counts to run concurrently.
 {¶ 21} On appeal, appellant sets forth the following single assignment of error for review:
THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL THEREBY DEPRIVING HIM HIS RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.
 {¶ 22} Under his sole assignment of error, appellant contends that his trial counsel was ineffective, thereby depriving him of a fair trial. More specifically, while appellant states that his trial counsel performed admirably for most of the trial (i.e., that he was prepared, subpoenaed witnesses and aggressively cross-examined the state's witnesses), appellant argues that counsel was deficient during the cross-examination of Detective Sheline.
 {¶ 23} In State v. Bradley (1989), 42 Ohio St.3d 136, 137, paragraphs two and three of the syllabus, the Ohio Supreme Court noted the applicable standard in considering a claim of ineffective assistance of counsel, stating as follows:
2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle
[1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623;Strickland v. Washington [1984], 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674, followed.)
3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.
 {¶ 24} In considering a defendant's claim of ineffective assistance of counsel, a reviewing court "must give great deference to defense counsel's performance and will not second guess [counsel's] trial tactics or related strategic decisions."State v. Jackson (July 28, 2000), Mahoning App. No. 98 C.A. 207. In order "`[t]o justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Id., quoting State v. Carter
(1995), 72 Ohio St.3d 545, 558.
 {¶ 25} Appellant first contends that his counsel's performance was deficient when, during the cross-examination of Detective Sheline, counsel elicited the detective's opinion as to whether or not he thought the evidence indicated the alleged victim was credible. Specifically, during cross-examination, defense counsel and Detective Sheline engaged in the following exchange:
Q. You didn't see with your own eyes the allegation that Jessica is making against her father, did you?
A. No.
Q. You wouldn't want somebody to admit to something that they didn't do, would you?
A. Absolutely not.
Q. And you wouldn't want somebody to admit to something they didn't do just because you have a different opinion, would you?
A. I don't understand what that means. What do you mean by that?
Q. In other words, I guess just what it says.
A. Because I have a different opinion?
Q. Well, your opinion is that he did it.
A. I believe that's what the evidence shows, correct.
Q. That's your opinion?
A. Correct.
Q. The evidence shows that she says he did it, correct?
A. Yes.
Q. There were no other eyewitnesses, correct?
A. That's correct.
Q. Okay, and that's my point. You wouldn't want somebody to admit to something they didn't do just because you have a different opinion, would you?
* * *
Q. And he told you he didn't do it.
A. That's what he says.
Q. And despite him telling you that he didn't do it and despite her saying that he did, with nobody else to witness the act you went and filed the charges, correct?
A. Correct.
(Tr. 184-186.)
 {¶ 26} In State v. Shafer, Cuyahoga App. No. 79758, 2002-Ohio-6632, the defendant asserted that his trial counsel was ineffective in actively seeking out opinion testimony from a detective about whether the victim was being truthful when he took her statement. Id. at ¶ 53. The court in Shafer rejected the defendant's ineffective assistance claim, noting that the line of questioning was part of trial counsel's strategy "to demonstrate that the police systematically give no presumption of innocence to potential defendants." Id. at ¶ 55. The court also noted in that case that the jury "had a full opportunity to gauge the victim's credibility because she testified" at trial. Id.
 {¶ 27} Similarly, in the instant case, trial counsel sought to show that the evidence for a conviction was weak, and that the detective failed to investigate the matter thoroughly before bringing charges, choosing instead to proceed based solely upon the victim's account, i.e., that the detective gave "no presumption of innocence" to appellant. Shafer, at ¶ 55. We also note, in this case, that the detective's response was not that the victim was telling the truth, but, rather, that it was his "belief in the victim's account of the incidents which led to [his] decision to pursue appellant's arrest." State v. Lee,
Franklin App. No. 02AP-1340, 2003-Ohio-4059, at ¶ 22 (finding no ineffective assistance of counsel where defense counsel asked detective whether she had an opinion, as opposed to factual knowledge, that allegations by victim were true).
 {¶ 28} We are mindful that witness credibility is a matter for the trier of fact alone, and that any personal opinion testimony by the detective was irrelevant to such determination. However, as in Shafer, the record indicates that the line of questioning at issue was part of counsel's strategy to cast doubt on the thoroughness of the police investigation. Under such circumstances, we decline to find, in hindsight, that such strategy was unreasonable.
 {¶ 29} Finally, the jury in this case heard the victim's testimony and was able on its own to assess her credibility.Shafer. Thus, even assuming we were to find this particular strategy unreasonable, we would find no prejudice under the second prong of appellant's ineffective assistance claim, as appellant has not shown it probable that the detective's statements on this issue contributed to the verdict.
 {¶ 30} We next address appellant's contention that his trial counsel was deficient in questioning the detective regarding the potential use of polygraphs during the investigation. Appellant cites the following exchange between defense counsel and Detective Sheline during cross-examination:
Q. * * * Let's just say you gave Jessica a polygraph prior to interviewing [appellant] or prior to arresting him. Wouldn't you feel better knowing the fact that she would have taken the polygraph?
A. My feeling on that is if a child has been victimized and I demand she take a police polygraph to prove that, I feel she's being further victimized by that. I simply asked a question of her to see what her response would be. She indicated that she would take the test. She had no problems doing that. I did not feel a polygraph examination in her case was necessary to prove her credible.
(Tr. 192.)
 {¶ 31} At the outset, we note that this case does not present the issue of whether the results of a polygraph were improperly admitted, as there was no testimony that either the alleged victim or appellant took a test. Rather, the above-cited testimony goes to the alleged victim's willingness to take a polygraph.
 {¶ 32} In general, the results of a polygraph examination to establish the guilt or innocence of a defendant are inadmissible, as well as the admission of the willingness or unwillingness of a party to take such an examination. State v. Williams (Mar. 26, 1997), Hamilton App. No. C-960296. On the record in the instant case, however, appellant cannot overcome the possibility that his counsel raised the polygraph issue as a matter of trial strategy.
 {¶ 33} A review of defense counsel's closing argument indicates that counsel, in questioning the detective about why he decided not to have the alleged victim undergo a polygraph, sought to raise doubt in the jury's mind about how thoroughly the detective performed his investigation, and whether the detective initially believed the victim. Specifically, during closing argument, counsel rhetorically asked why the detective would raise the issue of a polygraph "if after you've interviewed somebody you believe them yourself?" (Tr. 283.) Counsel also asked whether or not this case presented "the perfect situation and perfect circumstance to give somebody a polygraph to determine whether or not they're telling the truth before you go charge somebody?" (Tr. 283.) Counsel further questioned why the victim was not given a polygraph when it was "explained to [her] that it's not invasive, that it wouldn't take long." (Tr. 284.) Finally, counsel used this line of argument to portray the detective as "lazy" in his investigation. (Tr. 287.)
 {¶ 34} Further, defense counsel's questions on cross-examination eliciting the fact that the detective did not ask appellant to take a polygraph after he obtained counsel were arguably advanced to suggest that appellant may have been willing to take such an exam, but that the detective had already made up his mind to press charges at the time without fully investigating the allegations. Again, during closing argument, counsel raised the question as to why polygraphs were not taken, noting that the investigators "didn't bother to ask me if we [appellant] would do it once we got involved. * * * [C]ome on. I mean, the ramifications of a jury verdict back there are astronomical on these facts." (Tr. 284.)
 {¶ 35} Given the general rule of inadmissibility of polygraph evidence, we do not condone counsel's decision to inquire about its use in this case. However, references to polygraphs do not, per se, mandate reversal. See, e.g., Jackson (trial counsel's decision to waive preliminary hearing and stipulate to results of polygraph test "may have been advantageous" at time; although ultimate outcome of polygraph test proved to "not have been the best avenue of defense"); State v. Hubbard, Jefferson App. No. 01 JE 4, 2002-Ohio-6904 (trial counsel's performance not deficient in asking questions, as part of trial strategy, regarding polygraph examinations; counsel's questions concerning polygraph showed that witness had not taken a polygraph, and, therefore, her testimony might not be credible).
 {¶ 36} In the instant case, although we may take issue with the strategy employed, "a reviewing court cannot use the benefit of hindsight in determining whether a defendant received effective assistance of counsel." Jackson. Here, because the record suggests that the questioning of the detective regarding polygraph evidence was part of an overall trial strategy to challenge the police investigative process, appellant has failed to overcome the "strong presumption" that the conduct, strategy and tactics of his trial counsel fell within the wide range of reasonable assistance. Carter, at 558.
 {¶ 37} Based upon the foregoing, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Petree and Sadler, JJ., concur.